**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 23-cr-000359 (TSC)** |
| **v.** | |
| **GARRETT BRAGG,** | |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Mr. Bragg and his co-defendant Mr. Rollins engaged in a spree of bombings of commercial buildings in Maryland and D.C. They detonated explosives near populated areas with no concern for the damage they could cause and the harm they could do. Why did Mr. Bragg and Mr. Rollins expose our community to this reckless of violence? Money. Mr. Bragg and Mr. Rollins were testing a method for robbing ATMs and other stores. Chillingly, they did not rob a single store during their early morning spree. They caused thousands of dollars in damage and threatened human life all as practice to commit future crimes. This is not Mr. Bragg's first criminal offense; he has a history—albeit not lengthy—of charges and arrests for theft-related offenses. And when he was initially arrested, Mr. Bragg was found with sophisticated tools for engaging in additional crimes, and his storage locker had an arsenal of ammunition. Mr. Bragg was inadvertently released from custody. Despite being aware of an open warrant for his arrest, Bragg evaded law enforcement for approximately two months, after which he was found in a home with seven firearms. Mr. Bragg's egregious conduct, criminal history, and evasion of law enforcement justifies a significant term of incarceration.   For all of the following reasons, the Government requests that the Court sentence Mr. Bragg to ten years' incarceration followed by three years of supervised release.

# BACKGROUND

### *The Instant Offense*

On July 2, 2023, between 3:53 and 4:44 AM, Mr. Bragg and his accomplices placed and detonated four explosive devices in Maryland and D.C. outside commercial buildings. Surveillance video, license-plate readers, and cell site location data reflect that Bragg traveled between those four locations in a metallic Acura model TL sedan with Maryland license plate 17971CK. Images from Bragg's iCloud account indicates that this vehicle appears to have been his, suggesting he was the driver. At each location, Bragg's co-defendant Rollins stepped out of the vehicle, ignited and then placed or tossed a homemade explosive device, before driving to the next location and ultimately fleeing.

### *The 3:53 AM Bombing at 5430 Silver Hill Road, District Heights, Maryland*

At approximately 3:53 AM, Bragg and Rollins placed and detonated an explosive device outside of a Bank of America ATM at 5430 Silver Hill Road, District Heights Maryland, destroying the vestibule and structure surrounding the ATM.

*Figure 1*



2

The ATM was in a strip mall next to a beauty supply store, a grocery store, and a fast-food restaurant. Surveillance video reflects that Mr. Rollins—dressed in black Croc-style shoes, white socks, black Nike sweatpants, a light or cream-colored hoodie, a black face mask and black gloves approached the ATM prior to the bombing.

*Figure 2*



Mr. Rollins' hood is cinched to obscure his face. In his hands, Mr. Rollins was carrying a red-and-white striped tube which appears to be a homemade explosive device.

*Figure 3*



3

Mr. Rollins placed the device, lit it, and walked away before it exploded.

### *The 4:30 AM Bombing at Truist Bank, 2360 Washington Place NE, Washington, D.C.*

Thirty-seven minutes later, at approximately at approximately 4:30 AM, Mr. Rollins placed and detonated a second device outside of a Truist Bank at 2360 Washington Place NE, destroying the vestibule and structure surrounding multiple ATMs.[1]

*Figure 4*



This block, next to the Rhode Island Avenue Metro Station, includes both commercial businesses on the first floor, as well as multiple apartment buildings. Surveillance video reflects that Mr. Rollins—dressed exactly as he was when he placed the first bomb—stepped out of the passenger seat of the metallic sedan and approached the bank. He then placed a device consistent in

---

[1] This location is approximately nine miles from the first bombing and, during normal traffic conditions at legal speeds it would take a car approximately thirty-five minutes to drive that distance.

appearance with the first bomb, lit it, and fled the area in the same sedan, which also contained

Mr. Bragg.

*Figures 5 and 6*





At the time of the bombing a woman was seated on the same block as the explosion. The vehicle carrying Mr. Rollins, in which Mr. Bragg was either a passenger or driving, passed this woman before he placed the explosive device. She was fortunately not harmed.

### The 4:36 AM Bombing at the Nike Store at 700 H Street NE, Washington, D.C.

Six minutes later, at approximately 4:36 AM, a third device was placed and detonated outside of the Nike Store at 700 H Street NE, destroying the front vestibule.[2]



*Figure 7*



Surveillance video reflects that a metallic sedan approached the store, drove past it, made a U-turn, before stopping next to the store. Mr. Rollins then stepped out of the vehicle, rounded the corner, ducked into the entryway of the store, and then ran back to the vehicle.

*Figures 8 and 9*

---

[2] This location is approximately 2.5 miles from the first bombing and, during normal traffic conditions at legal speeds it would take a car approximately fifteen minutes to drive that distance. In the middle of the night with little traffic and at higher speeds it would take less time.



Shortly after, a device detonates, shattering windows in the store's vestibule. Mr. Rollins climbed back into the car and the vehicle fled along with Mr. Bragg.

### *The 4:44 AM Bombing of the Safeway at 322 40th Street NW, Washington, D.C.*

Eight minutes later, at approximately 4:44 AM, a fourth device was placed and detonated outside of a Safeway at 322 40th Street NE.[3]

*Figure 10*



---

[3] This location is approximately 2.5 miles from the first bombing and, during normal traffic conditions at legal speeds it would take a car approximately ten minutes to drive that distance. In the middle of the night with little traffic and at higher speeds it would take less time.

Surveillance video reflects that Mr. Rollins approached the front of the Safeway, lit a device consistent in appearance with the other three devices, and tossed it into the entryway.

*Figures 11 and 12*





The device exploded damaging the entryway doors and fixtures. Employees were present inside the store cleaning and preparing for the store to open. Indeed, one employee was standing just on the other side of the vestibule at the time of the explosion. Fortuitously, no one was harmed.

### ***The Bombing Vehicle***

The metallic Acura sedan used in the bombing bore Maryland license plate 17971CK. That license plate was provided by the state of Maryland to a private company that is authorized to sell titling papers and license plates but has never been registered to a vehicle. Despite concerted law

8

enforcement efforts to locate the vehicle, the vehicle has not been seen since the morning of July 2, 2023. Since the offense, this license plate has been placed on other vehicles, including a gray Dodge Durango that was used to rob an ATM from a 7-Eleven in Crofton, Maryland.[4]

***The Explosive Devices***

*Figures 13 and 14*



ATF Certified Explosives Specialists identified and collected the remnants of the suspected explosive devices at each of the four bombing locations. Analysis of the remnants indicates that similar devices exploded at each scene. Based on their analysis of the remnants on scene, as well as reviewing the damage to each building and surveillance footage of the devices and their

---

[4] In that robbery, a crew that appeared to be trained or experienced used a mechanical tool to remove the money from the ATM before fleeing in the Durango. The same group then drove to a 7-Eleven in Hyattsville, Maryland and robbed an ATM there in a similar manner. A gray Dodge Durango with a different license plate was subsequently used in multiple similar robberies around the DMV area of ATMs. In each, a crew of apparently trained individuals used mechanical or hydraulic tools to force open ATMs before fleeing.

explosions, ATF specialists identified these devices as homemade carboard encased explosive devices. Devices such as these are generally created by filling a cardboard or other tubing with potassium chloride or potassium chloride and aluminum. These components are referred to colloquially as flash powder. Flash powder is an explosive regulated by the ATF. Devices like these are not commercially manufactured or otherwise available for the public to purchase. Such devices are often referred to as "quarter" or "half sticks," though they are not technically dynamite. In their smallest form these devices are often referred to as M80s. These devices, however, appear significantly larger. When ATF has recovered devices of similar size, they have contained approximately four pounds of flash powder. The legal limit for possessing flash powder is fifty milligrams.[5]

### *The Identification of Mr. Bragg*

Law enforcement obtained search warrants for the cellular towers associated with the four bombing locations on the date and approximate times of the bombings. A device associated with Mr. Bragg was one of just four devices that were all in the vicinity of three of the four bombing locations.[6] One of the other devices was identified as belonging to Mr. Rollins.

Specifically, one of the devices was registered to an Apple account in the name "Garrett Bragg" with the email address "Dirtgangrico202@gmail.com" Law enforcement subsequently received records from Apple for this account. The account contained numerous photographs,

---

[5] 4 pounds of flash powder is equivalent to 1,814,368 milligrams. In other words, these devices were likely around 36,000 times the legal limit.

[6] The only bombing location at which this device did not appear was at the Nike Store bombing location. It is possible that given the relatively short amount of time the suspects spent at the Nike Store and given the relatively short distance between the Truist Bank Bombing, the Nike Store, and the Safeway, the device simply did not ping on towers servicing the Nike Store.

including many "selfie-style" photographs of an individual who appears to be Garret Bragg.

*Figures 15, 16, and 17*



The account also contained photographs of Mr. Bragg's license plate (front and back)

*Figures 18 and 19*





Additionally, the account included images of the bombing vehicle, complete with its license plate, dated June 21, 2023, approximately two weeks before the bombings.

*Figures 20 and 21*



The account included photographs of both the exterior of the vehicle, and the interior, including of the odometer, suggesting that this vehicle belonged to the individual (Bragg) taking these photographs. The Apple account also reflected messages identifying the user as Garrett or Garrett Bragg. Further, the account included messages between Bragg and Rollins on July 2, 2023, discussing obtaining tools to remove the rims of an Acura vehicle.

12

**_The September 29, 2023 Search Warrant of Mr. Rollins' Residence and Storage Unit_**

  In the course of this investigation, law enforcement became aware of a storage unit that was potentially linked to this offense, located at the Self-Storage Plus at 1325 Kenilworth Avenue, NE. While the unit was registered under a different name, records reflect multiple communications between Bragg and the listed owner, and the unit's records list the owner's email address as Bragg's email address (dirtgangrico202@gmail.com). Law enforcement obtained access records and surveillance video for the storage unit. Video reflects that Bragg regularly accessed the unit.

  The records and video also reflect that on July 1, 2023, several hours before the bombing at 6:30 PM, Mr. Rollins accessed the storage unit.

<em>Figures 22 and 23</em>



At the time he accessed the unit, Mr. Rollins is wearing the same pants, socks, and shoes as the

13

individual who placed and ignited the explosive devices several hours later.

*Figures 22 and 23*



Surveillance video reflects that Mr. Rollins returned to the storage unit at approximately 9:00 AM on July 2, 2023, less than five hours after the last bomb was detonated.

Law enforcement conducted surveillance on locations associated with Mr. Bragg and Mr. Rollins device. The devices were tracked to a home at 1635 U Street Southeast.[7]   On September 29, 2023, law enforcement executed a search warrant of that residence. Inside the home, law enforcement found both Mr. Bragg and Mr. Rollins.

When law enforcement announced themselves and entered the home, in an attempt to escape, Mr. Bragg exited a window and went onto the roof. Mr. Bragg then jumped two stories to the ground, breaking a leg, but still attempted to continue running before he was apprehended by

---

[7] Notably, based on metadata and surrounding buildings, this is where the photographs of the bombing vehicle that were in Bragg's iCloud account were taken.

law enforcement. In the home, law enforcement found the device associated with Mr. Rollins, and the device associated with Mr. Bragg. Mr. Bragg's device had been smashed in an apparent attempt to destroy it.

*Figures 24 and 25*



Additionally, law enforcement recovered a firearm on the porch, an extended magazine in the home, a bag of key fobs, a device that can be used for reprogramming key fobs to steal vehicles, and a backpack of burglary tools including headlamps, handheld radios, and hand tools. Mr. Bragg's iCloud records reflect that he had directed a girlfriend of his to purchase identical devices such as the device for reprogramming key fobs, from Amazon for him. While Mr. Rollins waited outside during the search warrant, a law enforcement officer offered to provide him with shoes. Rollins indicated that he had a bunch of shoes in the living room. Among the shoes in the living room was a pair of black Crocs consistent with those used during the bombings.

Law enforcement also conducted a search of the storage unit which was associated with Mr. Bragg and Mr. Rollins. Law enforcement recovered thirty-eight license plates, thousands of rounds of different ammunition (weighing more than two-hundred pounds), and additional burglary tools. Of the thirty-eight license plates, many were involved in other crimes in the area.

Following his attempt to flee the residential search warrant, Mr. Bragg was hospitalized. At the time of the search warrant, Mr. Bragg was the subject of an extraditable warrant from St. Mary's County Maryland for Burglary. Law enforcement spoke with Mr. Bragg in the hospital. During those conversations, Mr. Bragg indicated that he was aware of the open warrant for his arrest but was intentionally evading that warrant. Mr. Bragg was also informed that he was a subject of a separate investigation (specifically this investigation). Mr. Bragg was released from the hospital, but for some reason, was not properly detained as a fugitive and was released into the community.

On October 12, 2023, Bragg and Rollins were indicted on four separate counts for the Malicious Use of Explosive Materials in violation of 18 U.S.C. § 844(i), and warrants were issued for their arrest.

Law enforcement attempted to find Mr. Bragg for weeks, but Mr. Bragg did not maintain any stable residence. Law enforcement spoke to Mr. Bragg's family members, girlfriend, and the mother of his child, directing them to speak to Mr. Bragg and encourage him to turn himself in on his two open warrants. Mr. Bragg did not. In its efforts to find Mr. Bragg, the Government contacted his doctors who had treated his leg injury. Mr. Bragg provided his girlfriend's phone number and address to his doctors but did not appear to be residing at his girlfriend's address. After more than two months of attempting to locate Mr. Bragg, law enforcement finally found him

on December 14, 2023 in a residence in Temple Hills, Maryland. Initially, individuals inside the residence, including Mr. Bragg's girlfriend, denied knowing where Mr. Bragg was. Mr. Bragg was ultimately found concealed in the attic. Inside the home, law enforcement found four handguns, and three machine-gun style firearms. One of the firearms was in the room where Bragg was apparently residing.

On September 25, 2024, Mr. Bragg pled guilty to four counts of violating 18 U.S.C. 844(i) (Malicious Use of an Explosive Material).

### *The Pre-Sentence Report*

The Pre-Sentence Investigation Report (PSIR) summarizes Mr. Bragg's personal, educational, and criminal history. Mr. Bragg is thirty-four and was born in Jacksonville, Florida, but grew up in the District of Columbia. PSIR at ¶ 89. Mr. Bragg was raised by two parents and has two siblings. PSIR at ¶¶ 85-86. He reported that his parents provided all necessities, did not report any abuse or neglect, and described his childhood as "blessed."  PSIR at ¶ 86. Mr. Bragg is in a relationship and has two children from prior relationships. PSIR at ¶¶ 87-88. Mr. Bragg suffers from asthma and broke his leg as described above attempting to evade law enforcement. PSIR at ¶¶ 93-94. Mr. Bragg reports that he has a history of mental health and substance abuse issues. PSIR at ¶¶ 95, 97. Mr. Bragg completed up to the tenth grade in D.C. public schools. PSIR at ¶ 101. Mr. Bragg reported sporadic employment as a brick mason, at Safeway, and at a KFC. PSIR ¶¶ 106-107.

The PSIR reflects that Mr. Bragg was first arrested as an adult in 2009 for attempting to steal a tire from a stolen vehicle. PSIR at ¶ 71. Upon arrest, law enforcement recovered the keys to the vehicle in his pocket. *Id.* He was sentenced to fifteen days' imprisonment.

On April 20, 2014, Mr. Bragg was arrested for driving while impaired. PSIR at ¶ 72. He pled guilty and was sentenced to one day imprisonment. *Id.*

In addition to these convictions, there are two charges outstanding against Mr. Bragg in two different jurisdictions. In May 2020, he was arrested and charged in St. Mary's County, Maryland with Second Degree Burglary. PSIR at ¶ 80. A warrant was issued for Mr. Bragg on April 12, 2024 and remains pending. *Id.*

On January 3, 2024, Mr. Bragg was charged in Price George's County, Maryland for Illegal Possession of a Firearm. PSIR at ¶ 81. This offense relates to the firearms seized when law enforcement located and arrested Mr. Bragg on December 14, 2023, in Temple Hills, Maryland. *Id.*

### *The Applicable Guidelines Range*

The PSIR estimates a total offense level of 25, a criminal history category I, and a resulting applicable guidelines range of fifty-seven to seventy-one months, of which sixty months is mandatory. PSIR at ¶ 114. The PSIR also reflects a guideline term of supervised release of one to three years, and a fine of $20,000 to $200,000. PSIR at ¶¶ 119, 132. The Government agrees with these calculations.

## ARGUMENT

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v.*

*United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
> > (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
> > > (i) issued by the Sentencing Commission . . .; and
> > > (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
> > (A) issued by the Sentencing Commission . . . and
> > (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions.").

And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Mr. Bragg to ten years of incarceration, followed by three years of supervised release. The Government also recommends that Mr. Bragg and his co-defendant Mr. Rollins be ordered to pay restitution in the amount of $56,203.30. *See* PSIR at ¶ 30. This sentence provides a significant penalty to Mr. Bragg,

commiserate with the egregious nature of his violent offenses and the danger he poses to the community, as well as a significant deterrent to those who might imitate his crimes.

I.    **The Nature and Circumstances of Mr. Bragg's Offenses.**

The crimes to which Mr. Bragg pled guilty are incredibly serious. Mr. Bragg and his conspirators set and detonated four explosive devices in Maryland and D.C. in a chilling and dangerous late-night escapade. They did so without concern for the damage it would do to those businesses or the extreme threat to human life each device posed.

After planting the first bomb, and witnessing its destructive power, Mr. Bragg drove to Truist bank. Bragg and his accomplice drove past the bank and turned back around. As they did, they drove past a woman sitting on the sidewalk, their headlights illuminating her from just a car-length away. Despite this, Mr. Bragg's conspirator planted a bomb just down the block from this woman. He did so despite the many businesses in the area which could have employees reporting to open for the day. He did so despite the many residential apartments surrounding this bank. He planted and lit this bomb without hesitation for the property and lives he might destroy. Mr. Bragg did not object. Instead, he continued his rampage with Mr. Rollins.

After watching this second device detonate and cause significant damage, Mr. Bragg and his accomplices drove to the Nike Store on H Street NE. The H Street corridor is a heavily trafficked stretch of bars and restaurants. At that time, even at that hour, they passed multiple cars and people on the sidewalk. Undeterred by the possibility of the loss of human life, Mr. Bragg and his conspirators planted and ignited a third device.

Mr. Bragg's rampage continued. He and his accomplices drove to a Safeway. The lights in that Safeway were illuminated because its employees were already at work inside the store

preparing it for customers. At this final location, Mr. Rollins (apparently aware that there were people inside) did not carefully place the device in front of the store. Instead, Mr. Rollins callously tossed it at the front vestibule after igniting it. An employee was just inside the store past the vestibule when the device exploded. It is fortuitous that neither he nor any of the other employees were injured.

It is difficult to imagine more reckless, callous, or dangerous conduct than what Mr. Bragg and his conspirators engaged in on July 2, 2023. But their motive in doing so is particularly chilling. As noted above, Mr. Bragg and Mr. Rollins are tied to a series of ATM robberies involving, among other things, "Jaws of Life."  Devices associated with an unindicted co-conspirator were also present at the robbery locations. That unindicted co-conspirator is currently facing charges for a similar ATM robbery. And Mr. Bragg and Mr. Rollins exchanged messages discussing the robbery of at least one ATM, as well as obtaining hydraulic tools. Notably, Mr. Bragg and Mr. Rollins did not actually steal a single thing during these offenses. Instead, they appeared to be beta-testing a new robbery method on a variety of different targets. Mr. Bragg and Mr. Rollins caused thousands of dollars and damage and threatened human life as mere practice for future crimes. This behavior demands a significant term of incarceration.

## II.    **Mr. Bragg's History and Characteristics.**

While Mr. Bragg's criminal history is somewhat limited, he has a recent and consistent history of intentionally evading law enforcement and ignoring court-issued warrants for his arrest.

At the time Mr. Bragg engaged in this bombing spree, there was already an active warrant for his arrest. In the months that warrant was active, Mr. Bragg successfully managed to evade law enforcement detection. And even after he was investigated and charged in this case, Mr. Bragg

continued to successfully evade law enforcement for more than two months. His ability and sheer willpower to evade law enforcement is almost admirable. Few would have the determination to jump off a second story roof, break a leg, and yet still continue trying to run from law enforcement.

Mr. Bragg's conduct, and the implements of crime with which he was found, reflect that he is a sophisticated and practiced criminal. Mr. Bragg uses others to obscure his identity, making him incredibly difficult to locate. He does not order his own tools of crime for himself, relying on others. He maintains a storage unit containing pounds of ammunition, dozens of license plates that can be used to obscure the vehicles in which he drives, and tools for stealing vehicles. But he does not maintain that storage unit in his name, using another's identity to protect him. He does not maintain a stable residence, instead listing the residences of others. And he appears readily able to find those who will harbor him as well as locate illegal firearms.

Mr. Bragg's history of theft and burglary, coupled with his ready access to tools of theft and burglary, along with firearms, indicates that his criminal history understates his dangerousness. A significant period of incarceration is required to deter Mr. Bragg from future crimes.

### III.    The Need for the Sentence Imposed.

Mr. Bragg has access to sophisticated devices used to steal cars, tools used to obscure his identity, and explosive devices. He has no compulsion about using them. Indeed, he used multiple of these explosive devices to damage commercial buildings without regard to the damage or potential threat to human life. A term of incarceration within the Guidelines does not account for the egregious nature and circumstances of Mr. Bragg's offenses, particularly in light of his understated criminal history.

*First*, the Guidelines range here does not fully account for the four separate bombings in

which Mr. Bragg participated. The Guidelines range is effectively sixty to 71 months' incarceration. But if Mr. Bragg had committed just one bombing, his Guideline range would be sixty months' incarceration. Eleven additional months simply does not account for an additional bombing, let alone three additional bombings. The bombings did not grow less dangerous as they were committed, they grew more dangerous. While the first bombing appears to have been in a deserted shopping area, the second bombing was in a residential area. Indeed, Bragg and Rollins drove past a woman sitting nearby before Rollins planted a bomb. The third bombing was on the heavily trafficked H Street NE corridor, a strip where members of our community are present even in the middle of the night. And the fourth bombing was of a grocery store with employees inside and near the alcove which Mr. Bragg and Mr. Rollins exploded. A sentence even at the top of the Guidelines fails to account for the incredibly and increasingly dangerous and public nature of each additional bombing.

*Second*, the Guideline range does not account for the chilling nature of Mr. Bragg's and Rollins' exploits. They would be facing a guideline range of approximately sixty months' incarceration if they had simply blown up an ATM for no reason at all. But Mr. Bragg and Mr. Rollins had a reason. Their exploits that evening were part of a broader criminal enterprise to steal from others to enrich themselves. That motive—which is not an enhancement under the Guidelines—must be accounted for in sentencing. Specifically, it is that motive, and the efforts of men like Mr. Bragg and Mr. Rollins to cause terror for financial gain that must be deterred. A Guidelines sentence does not sufficiently deter their purposeful conduct.

*Third*, the Guideline range does not sufficiently account for Mr. Bragg's repeated attempts to evade arrest and obstruct justice. Mr. Bragg first attempted to evade a rest by jumping out of a

two-story window. At the time of his arrest, his phone had been smashed to destroy its evidentiary value to law enforcement. It is still not clear what evidence Mr. Bragg had on that phone and to what crimes that phone could have linked him. Due to human error, even though Mr. Bragg was made aware of an open warrant, after he was released from hospital he fled. He was able to evade arrest for two months when he was finally found in a home with seven guns, including three machine-gun style firearms. None of this behavior is accounted for by the Guidelines. But it should be. Mr. Bragg should not be treated like someone who was arrested without issue or turned himself in. He should be sentenced based on his actual conduct, and these efforts to evade arrest and destroy evidence should be punished and deterred.

*Finally*, as reflected above, Mr. Bragg's criminal history category understates his conduct and the danger he presents to our community. Mr. Bragg had access to dozens of license plates, many used in other crimes, a device for reprogramming key fobs to steal vehicles along with key fobs, and a backpack of burglary tools including headlamps, handheld radios, and hand tools. Given his history, the offense conduct, and Mr. Bragg's reported lack of employment history, it is evident the use to which Mr. Bragg was putting these tools.

The requested sentence of ten years' incarceration will further the goals of sentencing. It will specifically deter Mr. Bragg from committing crimes for a significant period of time, protecting our community from a proven danger. It will provide general deterrence, signaling to others that reckless violence undertaken for financial gains does not pay and will be taken seriously. Finally, it will provide a structured environment for Mr. Bragg to reflect on his offenses, enroll in needed vocational training, and return to society.

## CONCLUSION

For all the foregoing reasons, the Government requests that the Court sentence Mr. Bragg to ten years' imprisonment, followed by three years of supervised release, and restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


By:       */s/ Cameron A. Tepfer*
          Cameron A. Tepfer
          D.C. Bar No. 1660476
          Assistant United States Attorney
          601 D Street NW
          Washington, D.C. 20530
          202-258-3515
          Cameron.Tepfer@usdoj.gov